UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANE B. MODELL ROSEN,

Plaintiff,

-against-

N.Y.C. Department of Education; Melitina
Hernandez, Principal, P.S. 123M; Jennifer
Johnson, Ass't. Principal, P.S. 123M; Sean
Dunning Assistant Principal, P.S. 123M; Brittany
Velazquez, Ass't. Principal, P.S. 123M; Joshua
Furnell, Ass't. Principal, P.S. 123M,

Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   3/27/2023

18 Civ. 6670 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, Jane B. Modell Rosen, brings this action against the New York City Department

of Education (the "DOE"), Public School 123 Mahalia Jackson ("P.S. 123") Principal Melitina

Hernandez, and P.S. 123 Assistant Principals Jennifer Johnson, Sean Dunning, Brittany

Velazquez, and Joshua L. Furnell (the "Individual Defendants") under the Age Discrimination in

Employment Act (the "ADEA"), 29 U.S.C. § 623, the Americans with Disabilities Act (the

"ADA"), 42 U.S.C. § 12101 *et seq.*, the New York State Human Rights Law (the "NYSHRL"),

N.Y. Exec. L. § 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C.

Admin. Code § 8-101 *et seq.*  ECF No. 8.

On January 16, 2019, Defendants filed a motion to dismiss Rosen's amended complaint,

ECF No. 36, and on August 27, 2019, the Court dismissed Rosen's ADEA claims against the

Individual Defendants; her ADA, NYSHRL, and NYCHRL disability discrimination claims

against all Defendants; her NYSHRL and NYCHRL age discrimination claims based on

constructive discharge against all Defendants; her ADEA, NYSHRL, and NYCHRL age

discrimination claims based on retaliation against all Defendants; and her claims for punitive

damages against all Defendants, Order at 20, ECF No. 54.  Rosen's ADEA claims against the

DOE for age discrimination based on hostile work environment and constructive discharge and

her NYSHRL and NYCHRL claims against all Defendants for age discrimination based on

hostile work environment survived.  *Id.*  Defendants now move for summary judgment pursuant

to Federal Rule of Civil Procedure 56.  ECF No. 124.  For the reasons stated below, the motion is

GRANTED.

## BACKGROUND[1]

P.S. 123 is a public school that shares a building with a charter school, Success Academy

Harlem 5 Leadership, pursuant to a co-location sharing agreement.  Pl. 56.1 ¶¶ 149–50, ECF No.

126.  Success Academy Harlem 5 Leadership occupies the third floor of the shared building,

although P.S. 123 occupies at least six classrooms on the third floor, which are restricted to

school administrators and special education teachers.  *Id.* ¶¶ 151–52, 158.

In April 2013, Melitina Hernandez became the principal of P.S. 123.  *Id.* ¶¶ 4, 18.  At the

time, most of the teachers at P.S. 123 had no training in writing individualized education

programs ("IEPs"), had never written an IEP, and needed guidance through the IEP process and

special education procedures.  *Id.* ¶¶ 59, 76.  Under the Individuals with Disabilities Education

Act, every student with an identified disability must have an IEP.  20 U.S.C. § 1414(d);

*Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007).  Principal Hernandez

hired Louise Kapner as a consultant to assist P.S. 123 in the IEP process.  Pl. 56.1 ¶ 110.

---

[1] The facts in this section are taken from the parties' Rule 56.1 statements, unless otherwise noted.  Citations to a paragraph in the Rule 56.1 statement also include the other party's response.  "[W]here there are no citations or where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (alteration omitted).  On a motion for summary judgment, the facts must be read in the light most favorable to the non-movant.  *Id.* at 69.

In the summer of 2015, P.S. 123 was selected by the DOE to receive funding for an IEP teacher, a position created by the DOE to ensure sufficient teacher participation at IEP meetings and to direct instruction to special education or "at risk" students. *Id.* ¶¶ 53, 55. Schools with a high number of enrolled students with IEPs are selected by the DOE to receive funding for an IEP teacher position. *Id.* ¶¶ 53–54. The IEP teacher is responsible for preparing for and attending IEP meetings, conducting classroom observations, and providing special education and intervention services to students. *Id.* ¶¶ 47–48; *see also* Pl. Opp. Ex. 5, ECF No. 129-5; Pl. Opp. Ex. 6, ECF No. 129-6; Def. Mem. Ex. E at DEF_2063, ECF No. 125-9. The IEP teacher is also responsible for working on the school's compliance with IEP requirements, including reviewing IEPs and assisting other teachers in writing IEPs, and for scheduling meetings with parents and service providers. Pl. 56.1 ¶¶ 69–70. The school principal exercises discretion in programming the IEP teacher's schedule. *Id.* ¶ 49; Pl. Opp. Ex. 5; Def. Mem. Ex. E at DEF_2063. The IEP teacher is given an annual performance rating by the principal using a satisfactory/unsatisfactory rating system on a list of benchmarks. Pl. 56.1 ¶¶ 79–80.

In August 2015, Principal Hernandez hired Rosen as the IEP teacher at P.S. 123 because of her impressive credentials, expertise in special education law and procedures, and broad knowledge and experience. *Id.* ¶¶ 52, 60, 63–64, 67, 72–73. Rosen was approximately sixty-eight years old when she was hired. *Id.* ¶ 1. At the time, several IEPs were out of compliance. *Id.* ¶ 61. Hernandez asked Rosen to coach the special education teachers at P.S. 123, including Michelle Malverty. Def. 56.1 ¶ 183, ECF No. 127.

In the fall of 2015, Rosen alerted Hernandez to the fact that several IEPs that should have been written in 2014 were not written. Pl. 56.1 ¶ 75. Rosen then developed a teacher report that teachers were required to complete and that was intended to help teachers write their IEPs. *Id.*

3

¶ 81; Def. Mem. Ex. A Pt. 2 at 94:17-20, ECF No. 125-2; Def. Mem. Ex. A Pt. 3 at 116:15-25,

ECF No. 125-3.  Many teachers did not complete the reports, did not submit the reports on time,

or did not fill out the reports correctly.  Pl. 56.1 ¶¶ 83–85; Def. Mem. Ex. A Pt. 3 at 126:4-25.

Principal Hernandez sent emails reminding teachers that the reports were required.  Pl. 56.1 ¶ 86;

Def. Mem. Ex. A Pt. 3 at 124:18-23.  Rosen learned in the fall of 2016 that teachers had

complained about the form and felt it was time-consuming and overburdensome.  Pl. 56.1 ¶ 82;

Def. Mem. Ex. A Pt. 3 at 125:15–127:5.  P.S. 123 continued to struggle with IEP compliance

throughout the 2015-16 school year.  Pl. 56.1 ¶ 74.  Rosen received a satisfactory performance

rating for the 2015-16 school year.  *Id.* ¶ 89.

On April 11, 2016, Hernandez listed a job posting for the IEP teacher position for P.S.

123.  *Id.* ¶ 98; Pl. Opp. Ex. 6.  Rosen was offered the job for the 2016-17 school year.  Pl. 56.1

¶ 102.  In May 2016, the DOE notified P.S. 123 that it was again receiving funding for the IEP

teacher position.  *Id.* ¶ 95.  In June 2016, the DOE sent out information clarifying the purpose,

role, and responsibilities of an IEP teacher.  *Id.* ¶ 96; Pl. Opp. Ex. 5.  Hernandez did not revise

her April 11 posting.  Pl. 56.1 ¶ 101.

On May 26, 2016, Assistant Principal Dunning sent an email to a select number of

teachers offering a paid opportunity to complete out-of-compliance IEPs.  *Id.* ¶ 90.  Dunning did

not send this email to Plaintiff.  *Id.* ¶ 92.  Hernandez did not authorize Dunning's email.[2]  *Id.*

¶ 94; Pl. Opp. Ex. 2 at DEF_00004953, ECF No. 129-2.

During the 2016-17 school year, Rosen complained multiple times of "excessive,"

"inequitable," and "burdensome" paperwork.  Pl. 56.1 ¶ 103; Pl. Opp. Ex. 7, ECF No. 129-7; Pl.

---

[2] Rosen alleges that Principal Hernandez authorized Dunning's email or instructed him to write the email and to
exclude Rosen.  *See* Pl. 56.1 ¶¶ 93–94.  The Court does not credit Rosen's allegations because the record plainly
contradicts her assertion.  *See* Pl. Opp. Ex. 2 at DEF_00004953, ECF No. 129-2; *see also Holtz*, 258 F.3d at 73.

4

Opp. Ex. 8, ECF No. 129-8.  Rosen was referring to an Excel spreadsheet used by herself and the administration to share information about IEPs and weekly schedules that she was required to submit to Principal Hernandez.  Pl. 56.1 ¶¶ 103–04; Pl. Opp. Ex. 7; Pl. Opp. Ex. 8.  In October 2016, Rosen filed a grievance claiming excessive paperwork.  Pl. 56.1 ¶¶ 103–04; Pl. Opp. Ex. 8. Hernandez solicited other staff members to handle specific tasks for which Rosen was responsible, such as scheduling IEP appointments and making phone calls to parents.  Pl. 56.1 ¶ 105.  Rosen states that this did not help her in any meaningful way and only made her job more difficult.  *Id.*

On September 28, 2016, Rosen received a disciplinary letter from Principal Hernandez regarding Rosen's failure to manage the Chapter 408 compliance process.  *Id.* ¶ 106; Def. Ex. W at DEF_00086, ECF No. 125-27.  Staff members are required to sign Chapter 408 forms to acknowledge that their students are receiving IEP services and to record their agreement to provide mandated services.  Pl. 56.1 ¶ 107.  The IEP teacher is responsible for reviewing IEPs with teachers and collecting completed Chapter 408 forms.  Pl. Opp. Ex. 9 at DEF_00003542, ECF No. 129-9.  Chapter 408 forms must be signed by teachers and service providers and must include students' names, identification numbers, and programs.  Pl. 56.1 ¶¶ 112–13.  The September 28 letter states that Hernandez sent Kapner and Assistant Principal Furnell to meet with Rosen on September 7, 2016, to provide support in facilitating the Chapter 408 compliance process, and that Rosen did not inform Kapner or Furnell of the specific information that needed to be included in the Chapter 408 forms before staff members could sign them.  *Id.* ¶¶ 108, 111. At the first staff meeting of the school year, staff members were handed blank Chapter 408 forms that they could not sign, resulting in P.S. 123 being out of compliance.  *Id.* ¶¶ 115–16.

Rosen states that she did inform Kapner and Furnell of the requirements for the Chapter 408 forms.  *Id.* ¶¶ 111–13, 115.  Rosen emailed Kapner and school administrators in July and September, reminding them that Chapter 408 forms must be completed prior to the start of the school year.  Pl. Opp. Ex. 9 at DEF_00003540; *id.* at 2.  Rosen also emailed Hernandez in August, stating that the school's family worker "would fill out [the Chapter 408] forms and get signatures."  *Id.* at DEF_00003559; *id.* at 4.  On the first day of the school year, Rosen stated in an email to Hernandez that Hernandez should have printed copies of the Chapter 408 forms earlier, should have scheduled Rosen to give the required Chapter 408 form training at the staff meeting, and should not have yelled at Rosen in front of her colleagues.  Pl. Opp. Ex. 10, ECF No. 129-10.

By letter dated October 27, 2016, Principal Hernandez informed Rosen that Rosen had failed to provide mandated Special Education Teacher Support Services ("SETSS").  Pl. 56.1 ¶¶ 117–18.  Hernandez met with Rosen on October 21, 2016, to discuss the matter.  *Id.* ¶ 119. Rosen contends that the students to whom she was supposed to provide SETSS were not in school, not registered, not required to receive SETSS, or not mandated for special education services.  *Id.* ¶¶ 118, 120.  The October 27, 2016 letter was instructional, not disciplinary.  Pl. Opp. Ex. 11, ECF No. 129-11; Pl. Opp. Ex. 13, ECF No. 129-14.

By letter dated December 2, 2016, Assistant Principal Furnell notified Rosen of Rosen's failure on a number of occasions to provide Furnell with Rosen's weekly schedule.  Pl. 56.1 ¶ 122; Pl. Opp. Ex. 14, ECF No. 129-15.  By letter dated December 22, 2016, Assistant Principal Johnson disciplined Rosen for professional misconduct related to emails Rosen sent to the fifth-grade teachers.  Pl. 56.1 ¶¶ 123–24; Pl. Opp. Ex. 16, ECF No. 129-17.  Johnson informed Rosen that the fifth-grade teachers felt that Rosen's emails were offensive and accusatory, which

resulted in Johnson holding a mediation meeting with the fifth-grade team.  Pl. 56.1 ¶¶ 123–24;

Pl. Opp. Ex. 16, ECF No. 129-17.

On December 23, 2016, Rosen received a letter from Assistant Principal Furnell stating

that Rosen had engaged in professional misconduct during two incidents: (1) On October 6,

2016, Rosen "glared" at a child protective specialist from the Administration for Children's

Services ("ACS") and denied the specialist access to student records despite her attempt to

provide her ACS identification and to put Rosen in touch with her supervisor; and (2) on

November 14, 2016, Rosen had a phone call with a home instruction teacher who complained

that Rosen was "dismissive," "extremely condescending," and "aggressive."  Pl. 56.1 ¶¶ 125–26,

128–29; Pl. Opp. Ex. 18, ECF No. 129-19; Pl. Opp. Ex. 19, ECF No. 129-20; Pl. Ex. 20, ECF

No. 129-21.  Both the ACS specialist and the home instruction teacher filed complaints with the

DOE Office of Guidance and School Counseling.  Pl. 56.1 ¶ 127.  Rosen contends that she was

attempting to preserve student confidentiality and was not aware of new guidelines regarding

releasing information to ACS caseworkers.  *Id.* ¶¶ 125–26.

By letter dated December 23, 2016, Assistant Principal Furnell stated that Rosen was

insubordinate for failing to provide Rosen's weekly schedule.  *Id.* ¶¶ 130–31.  Rosen had

previously agreed, in the presence of her union representative, to submit her weekly schedule to

Principal Hernandez and Assistant Principals Furnell and Johnson every Friday by 2:00 p.m.  *Id.*

¶ 133.  Rosen contends that she was coerced to agree to this requirement.  *Id.*  On December 16,

2016, Rosen and her union representative met with Furnell, who asked for an explanation as to

why Rosen was not submitting her weekly schedule, and Rosen expressed that the request was

overburdensome and unnecessary.  *Id.* ¶ 134.

On January 24, 2017, Rosen received a letter from Assistant Principal Furnell stating that Rosen had failed to provide SETSS to a student, K.T.  *Id.* ¶ 135.  Rosen contends that K.T. was late or absent many times during the year such that she could not provide services.  *Id.*  She does not dispute the statements in the January 24, 2017 letter that she was regularly late to pick up K.T., she never provided K.T. with a full period of service, and she failed to provide SETSS on at least three occasions when K.T. was present and on time.  Pl. Opp. Ex. 22, ECF No. 129-23; Pl. Opp. Ex. 23, ECF No. 129-24.  On December 20, 2016, Furnell informally observed Rosen with K.T. and provided feedback in a letter dated January 24, 2017.  Pl. 56.1 ¶¶ 137–38; Pl. Opp. Ex. 24, ECF No. 129-25.  Furnell then designed an action plan to help Rosen improve in certain areas he cited in his feedback letter, which plan included additional support for Rosen from the lead teacher, Ms. Holland, and weekly meetings between Rosen and Furnell to discuss Rosen's work plans for the following week.  Pl. 56.1 ¶¶ 139–41.  It is school policy at P.S. 123 to implement a plan to provide extra support when a teacher receives a poor review.  *Id.* ¶ 142.

On January 31, 2017, Rosen and her union representatives met with Principal Hernandez and Assistant Principal Johnson to discuss Rosen's grievance that, without justification, Hernandez removed a major portion of Rosen's originally scheduled IEP work periods and revamped her schedule.  *Id.* ¶ 143.  Hernandez stated that Rosen's schedule was amended to conform to the duties as listed in the 2016-17 job posting for the IEP teacher position, which included intervention services because Rosen no longer had any SETSS students on her caseload. Pl. Opp. Ex. 25, ECF No. 129-26.  Hernandez also asked the school's family worker to schedule IEP meetings in response to Rosen's complaint that she did not have enough time for scheduling, although Rosen was still responsible for conducting the IEP meetings.  *Id.*; Pl. 56.1 ¶ 144.  In response to Rosen's statements that she did not have sufficient planning time in her schedule or

sufficient instructional materials, Hernandez stated that Rosen denied the professional development support offered to her by Assistant Principal Furnell and Ms. Holland, and that Rosen had daily planning time built into her schedule.  Pl. Opp. Ex. 25.  Rosen stormed out of the meeting while yelling.  *Id.*; Pl. 56.1 ¶ 145.  Rosen received a letter from Principal Hernandez on February 3, 2017, memorializing the January 31, 2017 meeting and denying Rosen's grievance.  Pl. Opp. Ex. 25; Pl. 56.1 ¶¶ 146–47.  Rosen contends that her duties should have been assessed according to the DOE's amended guidelines for the IEP teacher position rather than Hernandez's posting for the 2016-17 school year.  Pl. 56.1 ¶ 143.

On August 5, 2016, and January 31 and February 3, 2017, Rosen was asked to leave her office on the third floor after 4:00 p.m., as P.S. 123's co-location sharing agreement did not permit occupancy of the third floor after 4:00 p.m. without an additional permit.  *Id.* ¶¶ 154–56. Rosen contends that no such restriction exists and that it was fabricated by Principal Hernandez to create a hostile working environment.  *Id.*  On February 6, 2017, the administration sent all P.S. 123 staff a letter informing them of the policies and procedures regarding use of classrooms after instructional time, including that all staff members on the third floor must exit at 4:00 p.m. *Id.* ¶¶ 161–62.  In response to Rosen's request to see the permit restricting P.S. 123 staff access to the third floor, Hernandez asked Frank Jordan, New York City Police Department ("NYPD") Borough Safety Director for the DOE, whether staff members can either view or be given a copy of the permit.  *Id.* ¶ 160; Pl. Opp. Ex. 26 at DEF_0882, ECF No. 129-27.  Jordan informed Hernandez that staff may not remove or copy the permit but may view it in a secure location.  Pl. Opp. Ex. 26 at DEF_0882.  Assistant Principal Johnson subsequently asked Rosen when she would like to review the permit, but Rosen and Johnson did not schedule a time to review the permit.  *Id.* at DEF_0876–DEF_0880.  Rosen states that she has never seen the permit.  Pl. 56.1

¶ 160.  Rosen filed a grievance on February 5, 2017, stating that she was escorted from the building by security officers on three occasions, she felt threatened during these incidents, and other staff were permitted to remain in the building.  Pl. Opp. Ex. 26 at DEF_0865–DEF_0867.

By letter dated February 27, 2017, Assistant Principal Furnell disciplined Rosen for professional misconduct regarding a professional development session with Furnell on February 13, 2017, during which Rosen refused to cooperate or participate.  Pl. 56.1 ¶¶ 163–64; Pl. Opp. Ex. 27, ECF No.129-28.  Rosen contends that she did cooperate and participate.  Pl. 56.1 ¶ 164; Pl. Opp. Ex. 28, ECF No. 129-29.  On March 24, 2017, Rosen received a letter from Assistant Principal Johnson for insubordination related to an incident on March 2, 2017, during which Rosen switched her class assignment without prior authorization.  Pl. 56.1 ¶¶ 165–66.  Rosen contends that she did so because the assignment was unsafe and was given to her to contribute to a hostile work environment.  *Id.* ¶¶ 166–167; Pl. Opp. Ex. 29, ECF No. 129-30; Pl. Opp. Ex. 30, ECF No. 129-31.

During the 2015-16 school year, Rosen was the district representative for annual IEP reviews for P.S. 123, as well as the special education liaison.  Def. 56.1 ¶¶ 184, 186.  During the 2016-17 school year, Rosen remained the district representative for annual meetings, Malverty was assigned as the special education teacher on record for school-based support team meetings, and Kathy Rivera was assigned to be the district representative for initial, triennial, and re-evaluation meetings.  *Id.* ¶¶ 185, 192; *see also* Pl. Ex. 36, ECF No. 129-37.  Malverty was designated as the special education liaison for the 2016-17 school year and was assigned to provide professional development workshops in special education.  *Id.* ¶¶ 187–88.  Malverty and several other teachers were tasked with ensuring Chapter 408 compliance during the 2016-17 school year and with redesigning the teacher reports.  *Id.* ¶¶ 189–90; Pl. Opp. Ex. 34 at 2, ECF

No. 129-35; Pl. Opp. Ex. 35 at 2, ECF No. 129-36.  Malverty also assisted other teachers in

writing their IEPs during the 2016-17 school year and took over some IEP teacher duties while

Rosen was absent due to a medical procedure.  Def. 56.1 ¶¶ 191, 193; Def. Mem. Ex. C at

138:24–141:23, ECF No. 125-7.  Malverty fulfilled the duties of another special education

teacher during that teacher's absence in the 2016-17 school year.  Def. 56.1 ¶ 194.  Malverty is

significantly younger than Plaintiff.  Pl. 56.1 ¶ 168.  She was a teacher at P.S. 123 prior to 2013

and was tenured in 2015.  *Id.* ¶¶ 169, 171.  Malverty is a licensed special education teacher and

served as a lead teacher during the 2016-17 school year.  *Id.* ¶¶ 170, 172, 174.

Rosen retired in May 2017.  *Id.* ¶ 68.  Although Rosen never formally notified the school

of her retirement, the school became aware of her retirement on May 11, 2017.  *Id.* ¶ 179.

Malverty became the IEP teacher for P.S. 123 for the 2017-18 school year.  *Id.* ¶¶ 175, 177.  In

2020, Malverty was named an Assistant Principal at P.S. 123.  *Id.* ¶ 178.

Hernandez consulted with DOE Human Resources regarding Rosen's rating for the 2016-

17 school year.  Pl. 56.1 ¶ 148; Def. 56.1 ¶ 195.  Hernandez changed Rosen's ratings for two

benchmarks to unsatisfactory.  Pl. 56.1 ¶ 148; Def. 56.1 ¶ 195.  Rosen received an overall

unsatisfactory rating for the 2016-17 school year.  Pl. 56.1 ¶ 180.

## DISCUSSION

I.  Summary Judgment

A.  Standard of Review

Summary judgment is appropriate when the record shows that there is no genuine dispute

as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986); *Celotex

Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986).  A genuine dispute exists "if the evidence is such

that a reasonable jury could return a verdict for the non[-]moving party." *Anderson*, 477 U.S. at 248.  The moving party initially bears the burden of informing the court of the absence of a genuine dispute of material fact by citing particular evidence in the record.  Fed. R. Civ. P. 56(c)(1); *see also Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002).  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of material fact.  *Beard v. Banks*, 548 U.S. 521, 529 (2006); *PepsiCo, Inc. v. Coca-Cola Co*., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).  In doing so, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), as "unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).  In deciding the motion, the court views the record in the light most favorable to the non-moving party.  *Koch*, 287 F.3d at 165.

Courts must be "cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question," and must "carefully scrutinize[]" the non-movant's affidavits and depositions for "circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citation omitted).

B.   ADEA, NYSHRL, and NYCHRL Claims

The ADEA, NYSHRL, and NYCHRL make it unlawful for an employer to discriminate against an individual over the age of forty with respect to compensation, terms, conditions, or privileges of employment based on that individual's age. *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 41 (2d Cir. 2019) (citing 29 U.S.C. §§ 623(a)(1), 631(a)); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010); and *Nixon v. TWC Admin. LLC*, No. 16 Civ.

6456, 2017 WL 4712420, at *5 (S.D.N.Y. Sept. 27, 2017)).  Discrimination claims under the ADEA, NYSHRL, and NYCHRL are analyzed using the three-step *McDonnell Douglas* framework.  *See Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000); *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 357–59 (S.D.N.Y. 2012); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The *McDonnell Douglas* framework first requires a plaintiff to establish a prima facie case of discrimination.  *Schnabel*, 232 F.3d at 87; *Malena*, 886 F. Supp. 2d at 357.  If the plaintiff meets this burden, the defendant must offer a legitimate, nondiscriminatory business rationale for its actions.  *Schnabel*, 232 F.3d at 87; *Malena*, 886 F. Supp. 2d at 359.  If the defendant does so, then the burden shifts back to the plaintiff to prove that the defendant's actual purpose was discriminatory.  *Schnabel*, 232 F.3d at 87; *Malena*, 886 F. Supp. 2d at 359.  The plaintiff must present evidence on which a reasonable trier of fact could conclude that the defendant's purported rationales are pretextual and that age was a determinative factor in the actions taken against the plaintiff.  *Schnabel*, 232 F.3d at 91.

The Court has already decided that Rosen has met her "minimal" burden of establishing a prima facie case of age discrimination.  *See* Order at 13–19; *see also Schnabel*, 232 F.3d at 87 (citing *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 199 (2d Cir. 1999)).  She has made out a prima facie case under the ADEA based on a hostile work environment and constructive discharge and under the NYSHRL and NYCHRL based on a hostile work environment because she has shown that she is a member of a protected class, she was qualified for her position, she suffered an adverse employment action, and the adverse action occurred under circumstances giving rise to an inference of discrimination.  *See* Order at 13–19; *see also Friedman v. Swiss Re Am. Holding Corp.*, 643 F. App'x 69, 71 (2d Cir. 2016) (summary order); *Gorzynski*, 596 F.3d at 106–07; *Nixon*, 2017 WL 4712420, at *5.

13

Now, the Court finds that Defendants have satisfied their burden of articulating legitimate, nondiscriminatory business reasons for the adverse employment actions of which Rosen complains.  Defendants provide "clear and specific" reasons, supported by evidence, for the disciplinary actions taken against Rosen.  *Schnabel*, 232 F.3d at 88; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).  Defendants state that Rosen was disciplined for her failure to fulfill her duties, professional misconduct, and repeated insubordination, and that some of Rosen's responsibilities were given to other teachers in response to her complaints of being overwhelmed.  Pl. 56.1 ¶¶ 103–06, 111, 113, 117, 122–26, 130–31, 135, 143–45, 154–56, 163–66; Def. 56.1 ¶¶ 185, 187, 189–90, 192–94.

Rosen has failed to show that Defendants' proffered reasons for the actions taken against her were pretextual or that they were intended to discriminate against her because of her age. Rosen alleges that Principal Hernandez intended to hire her, have her mentor Malverty, to whom Hernandez also served as a mentor, and then replace her with Malverty.  *See* Pl. Opp. at 1–2, ECF No. 129; *see generally* Pl. 56.1.  Rosen claims that various adverse actions were taken against her for the purpose of creating a hostile work environment and ultimately constructively discharging her in order to replace her with Malverty.  *See* Pl. Opp. at 1–2; *see generally* Pl. 56.1.  The record does not support her claims, and she has failed to raise a triable issue of fact.

First, Rosen contends that Principal Hernandez blamed Rosen rather than holding teachers accountable for not timely completing their teacher reports or IEPs.  Pl. Opp. at 5.  The record shows that Hernandez did follow up with teachers about untimely and incomplete reports and IEPs.  *See* Pl. Opp. Ex. 4 at 3, ECF No. 129-4.  More importantly, the record does not show that any adverse action was taken against Rosen or that any negative comments were made to Rosen regarding the teacher reports.

14

Second, Rosen alleges that she was excluded from a paid opportunity to complete out-of-compliance IEPs by Assistant Principal Dunning, which was offered to teachers younger than Rosen, and that Principal Hernandez authorized Rosen's exclusion.  Pl. Mem. at 5.  Rosen provides no evidence regarding the ages of the teachers who were offered this opportunity, and the record shows that Hernandez did not authorize or approve of Rosen's exclusion, and that the opportunity was cancelled.  *See* Pl. Opp. Ex. 2 at DEF_00004953.  Rosen has not established that she was excluded because of her age, much less that this was part of a larger scheme by Hernandez to replace Rosen with Malverty.

Third, Rosen claims that Hernandez purposefully did not tell her that the DOE had issued guidelines regarding clarification of the IEP teacher position, that the job posting for the 2016-17 school year that Hernandez posted and to which Rosen responded was significantly different from the DOE's new guidelines, and that Hernandez "capitalize[d]" on the fact that the new position had a three-year duration which could only be cut short if the IEP teacher received an unsatisfactory performance rating.  Pl. Mem. at 7.  Rosen contends that Hernandez then proceeded to pad her file with disciplinary letters to justify an unsatisfactory rating and, ultimately, Rosen's removal.  *Id.*  The record contradicts Rosen's allegations.

The IEP teacher position to which Rosen applied and for which she was hired for the 2015-16 school year was a one-year position.  *See* Pl. Opp. Ex. 5 at DEF_1779; Pl. Opp. Ex. 6.  Hernandez posted the 2016-17 opportunity before the DOE sent the revised IEP teacher guidelines.  Pl. 56.1 ¶¶ 95–97.  Hernandez offered the 2016-17 position to Rosen.  *Id.* ¶ 102.  Further, the new DOE guidelines indicated that principals that had previously selected an IEP Teacher "were given the option of continuing with that individual or using [the new] posting to select a candidate."  Pl. Opp. Ex. 5 at DEF_1781.  Hernandez chose to continue with Rosen.

15

Rosen contends that Hernandez had already developed a discriminatory animus towards her by the 2016-17 school year, but this is inconsistent with Hernandez's decision to rehire her. *See Schnabel*, 232 F.3d at 91; *see also Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997).

Rosen argues that her schedule during the 2016-17 school year should have been determined by the new DOE guidelines rather than Hernandez's original job posting, and Rosen objected to Hernandez's amendment of Rosen's schedule and the assignment of duties "prohibited" under the new DOE guidelines. *See* Pl. 56.1 ¶ 143, Pl. Opp. Ex. 25. But, the DOE guidelines specifically require the kind of special instruction and intervention services Rosen was assigned to provide, and the DOE guidelines allow some discretion on the part of the principal in designing the IEP teacher schedule in accordance with the school's needs. Pl. Opp. Ex. 5 at DEF_1779–DEF_1780, DEF_1782–DEF_1783; Pl. Opp. Ex. 25. Rosen complains that the DOE guidelines required mandated professional development sessions, of which Hernandez did not advise her. Pl. Opp. at 7. However, Rosen was notified by the DOE upon being hired about the professional development requirements. Pl. Opp. Ex. 39, ECF No. 129-40. Rosen alleges that Hernandez docked her pay for attending a required professional development workshop, Pl. Opp. at 7, but Hernandez testified, and Rosen does not contest, that Rosen was disciplined for not returning to school after the half-day workshop. Def. Mem. Ex. B at 225:25–226:11, ECF No. 125-6. Rosen has not shown that Hernandez's proffered reasons for the actions taken against Rosen were pretextual, let alone taken for a discriminatory purpose.

Fourth, Rosen contends that Principal Hernandez subjected her to unnecessary, redundant, and overburdensome paperwork in the form of excessive emails, schedules, and Excel spreadsheets, that Hernandez ignored her complaints about the excessive paperwork, and that she

was erroneously disciplined for not complying with these overburdensome requirements.  Pl.

Opp. at 7–8, 10–11.  Rosen complained specifically about being required to submit a weekly

schedule and Excel spreadsheets.  Pl. Opp. Ex. 8.  In response to her grievance about

spreadsheets, Hernandez stated that Rosen was only required to update one Excel spreadsheet

with IEP benchmark completion dates, that the spreadsheet was useful for Rosen and the

administration to share important information, and that the administration would discuss

revisions to some fields in the spreadsheet in response to Rosen's complaints.  Pl. Opp. Ex. 7 at

DEF_00013.  Rosen states that she did not know how to use Excel at the time and needed

training to operate the spreadsheet, Pl. 56.1 ¶ 104, but the record does not show that Rosen raised

this concern with administrators or sought training or instruction.

Rosen complained several times about being required to submit a weekly schedule and

stated that she did not have enough time to do so.  *See* Pl. Opp. Ex. 15, ECF No. 129-16; Pl.

Opp. Ex. 7.  On multiple occasions, Hernandez told Rosen that she should complete her weekly

schedule during her planning period, and that every teacher is required to engage in similar

planning and preparation.  Pl. Opp. Ex. 15; Pl. Opp. Ex. 25 at DEF_00069.  The record shows

that, as of December 2, 2016, Rosen had not provided administrators with her schedule as

required, and that Rosen told Assistant Principal Furnell that if he wanted to write her up for not

sending her schedule, that was fine with her.  Pl. Opp. Ex. 14.  After December 2, 2016, Rosen

continued to fail to provide a weekly schedule.  Pl. Opp. Ex. 21, ECF No. 129-22.  Rosen was

told that the weekly schedule was intended to give her freedom in planning as well as allow

administrators to support her; Rosen told administrators that she did not need their support.  *Id.*

Rosen was twice disciplined for failing to provide her schedule, and, ultimately, administrators

began providing Rosen with a set schedule rather than allowing her to create her own weekly

schedule.  Pl. Opp. Ex. 7 at DEF_00013; Pl. Opp. Ex. 21.  The record does not show that the

spreadsheet or scheduling requirements were objectively burdensome, that the administration

was unresponsive to Rosen's complaints, that the disciplinary actions taken against Rosen were

pretextual, or that the spreadsheet and schedule requirements were imposed, or that the

disciplinary actions were taken, for a discriminatory purpose.

Fifth, Rosen contends that, without justification, Hernandez accused Rosen of failing to

manage the Chapter 408 compliance process.  Pl. Opp. at 8–9.  Rosen states that Hernandez

"rais[ed her] voice" and blamed Rosen "while standing in the cafeteria and in front of everyone,

for the lack of preparation" for the Chapter 408 requirement.  Pl. Opp. Ex. 10.  The record

establishes that: (1) Chapter 408 compliance is the responsibility of the IEP teacher, Pl. Opp. Ex.

9 at DEF_00003542; (2) Rosen told administrators in the summer of 2016 that the school's

family worker would complete the Chapter 408 forms, *id.* at DEF_00003559; *id.* at 4, and that

Rosen would present a professional development workshop at the staff meeting prior to the start

of the school year to complete the Chapter 408 forms, *id.* at DEF_00003540; (3) Rosen told

administrators that the Chapter 408 forms must be completed prior to the start of the school year,

*id.* at 2; (4) Hernandez did not make copies of the Chapter 408 forms and did not schedule Rosen

to give a professional development workshop at the staff meeting prior to the beginning of the

school year, Pl. Opp. Ex. 10; and (5) Hernandez publicly yelled at Rosen, *id.*  Defendants allege

that Rosen did not inform administrators of specific information that needed to be included in the

Chapter 408 forms.  Pl. 56.1 ¶¶ 111–13.  There is no evidence that Rosen provided that

information.

Interpreting the facts in the light most favorable to Rosen, the record shows that she

reminded administrators of the deadline for the Chapter 408 forms and gave somewhat

conflicting information about how the forms would be completed, *i.e.*, by the family worker, or by staff members during the staff meeting with Rosen's guidance.  The record does not establish that Hernandez made any age-related comments to Rosen.  *See Schnabel*, 232 F.3d at 91.  That Hernandez yelled at Rosen in front of other staff members does not evince a discriminatory motive on Hernandez's part.  *See Campbell v. Bottling Grp., LLC*, 814 F. App'x 630, 633 (2d Cir. 2020) (summary order) ("[C]onclusory and generalized allegations of harassment and criticism of [Plaintiff's] job performance do not establish a nexus to a protected ground [in order to establish discriminatory intent].").  Rosen has not demonstrated that Defendants' account of the events is pretextual or that any actions taken against her were due to her age.

Sixth, Rosen contends that she was erroneously disciplined on two separate occasions for failing to provide SETSS.  Pl. Opp. at 9.  Providing SETSS was part of Rosen's responsibilities as IEP teacher.  Pl. Opp. Exs. 5–6.  Rosen contends that the students to whom she was supposed to provide services were not in school, not registered, not mandated for special education services, or not slated to receive SETSS.  Pl. Opp. at 9.  The record shows that Rosen did not provide any SETSS prior to October 17, 2016, even though the IEPs for at least some of the students for whom she was supposed to provide services had not been revised and finalized to omit SETSS at the time she failed to provide services.  Pl. Opp. Ex. 11; Pl. Opp. Ex. 12 Pt. 1 at 3, 5, ECF No. 129-12; Pl. Opp. Ex. 12 Pt. 2 at 4, ECF No. 129-13.  And, all but one of the students to whom she was supposed to provide SETSS were absent for, at most, four school days prior to October 17, 2016.  Pl. Opp. Ex. 12 Pt. 2 at 7–13.  With respect to at least one student, D.R., Rosen does not provide any evidence to support her proffered excuses for failure to provide SETSS.  *Id.* at 5, 13.  Moreover, the October 27, 2016 letter Rosen received regarding failure to provide SETSS was not disciplinary.  Pl. Opp. Ex. 11; Pl. Opp. Ex. 13.

The January 24, 2017 letter Rosen received was for failure to provide SETSS to a specific student, K.T., who Rosen alleges was absent thirty-seven times and late nineteen times such that she could not provide SETSS on those days.  Pl. Opp. at 12.  The record shows that Rosen never provided K.T. with a full period of service, did not wait for K.T. on days that K.T. was late, and was regularly late in picking up K.T. from class.  Pl. Opp. Ex. 22.  Further, although K.T. was frequently absent or late, on seven specific dates, K.T. was on time or present before 8:30 a.m. and still did not receive services.  Pl. Opp. Ex. 22; Pl. Opp. Ex. 23.  Thus, the record does not support the conclusion that the letters regarding Rosen's failure to provide SETSS were pretextual or that they were issued for the purpose of discriminating against her because of her age.

In response to Rosen's failure to provide services to K.T., Assistant Principal Furnell engaged in an informal observation of Rosen with that student.  Pl. Opp. Ex. 24.  Rosen contends that this observation was "patently invalid and pedagogically unsound" because Furnell did not review the student's IEP or Rosen's lesson plan.  Pl. Opp. at 12.  Rosen provides no evidence to support that allegation.  The record establishes that Furnell observed Rosen, took detailed notes, provided specific feedback, and reviewed and referenced Rosen's lesson plan.  Pl. Opp. Ex. 24.  Further, pursuant to school policy, Rosen was provided with an action plan in order to provide her with extra support, which included weekly meetings with Furnell and lead teacher Ms. Holland to discuss teaching strategies.  Pl. 56.1 ¶ 142; Pl. Opp. Ex. 24 at DEF_00075.  Rosen subsequently declined to participate in at least one of these meetings, Pl. Opp. Ex. 25, and was disciplined for failing to participate in a second meeting, Pl. Opp. Ex. 27.  Rosen claims she did participate, as evidenced by her signature on an attendance sheet and her completion of a worksheet, Pl. Opp. Ex. 28, but she does not contest that she abruptly interrupted the meeting to

answer emails or that, at one point, she refused to continue the meeting, Pl. Opp. Ex. 27.  Rosen

has not shown that the disciplinary action was pretextual or motivated by a discriminatory

purpose.

Seventh, Rosen contends that she was erroneously disciplined for professional

misconduct for sending emails to the fifth-grade teachers which the teachers felt were offensive.

Pl. Opp. at 10.  Rosen argues that she did not engage in inappropriate conduct with those

teachers and that she was only criticized as a "pretextual excuse."  *Id.*  But, she does not dispute

that the fifth-grade teachers complained to Assistant Principal Johnson or that Johnson had to

conduct a mediation meeting with them to address their feelings that Rosen was "laying blame"

on them.  Pl. Opp. Ex. 16.  Further, the emails between Rosen and the fifth-grade teachers do

appear to be contentious and accusatory, and Johnson told Rosen as much prior to the incident

which resulted in the fifth-grade teachers' complaint.  Pl. Opp. Ex. 17 at 2, 6, ECF No. 129-18.

The emails reflect a tense work environment, but do not reflect any attempt by the administration

to foster hostility, as Rosen alleges.  Rosen has not shown that the disciplinary action was

pretextual or taken for a discriminatory purpose.

Eighth, Rosen contends that she was erroneously disciplined for professional misconduct

in connection with two incidents that resulted in complaints filed with the DOE's Office of

Guidance and School Counseling.  Pl. Opp. at 10–11; Pl. 56.1 ¶¶ 125–29.  Rosen contends that

the complaints were "orchestrated" by the administration, and that she was protecting student

confidentiality.  Pl. Opp. at 11.  The first incident involved Rosen's refusal to provide access to

student records to an ACS child protection specialist, and the second involved Rosen's treatment

of a home instruction teacher during a phone call.  Pl. Opp. Ex. 18.  The record shows that Rosen

was not aware of an updated policy regarding the provision of information to ACS caseworkers

and suggests that neither the administration nor any other staff at P.S. 123 had completed the updated training.  Pl. Opp. Ex. 19 at 5–11.  Rosen does not contest that she refused to speak to the ACS specialist's supervisor over the phone when the specialist attempted to clarify the situation, or that she glared at the specialist.  *Id.* at 2–4.  Rosen also does not contest that she treated the home instruction teacher in a "dismissive," "condescending," "aggressive," and "insulting" manner.  Pl. Opp. Ex. 18.  Rather, Rosen shows that she also filed a complaint against the home instruction teacher for being "evasive," "sarcastic[]," "angry," "rude," "argumentative," and "adversarial."  Pl. Opp. Ex. 20.  The record establishes that Rosen had two contentious interactions with two individuals who each lodged separate complaints with the DOE.  There is no evidence that the P.S. 123 administration had any role in "orchestrating" the incidents or the complaints.  Rosen has not shown that the disciplinary action was pretextual or that it was taken for a discriminatory purpose.

Ninth, Rosen alleges that Principal Hernandez "fabricate[d]" the existence of a building permit in order to "forcefully remove" her from the school on three occasions, which caused her to fear for her safety.  Pl. Opp. at 13–14.  But, the record shows that all P.S. 123 staff, not just Rosen, were informed about the building permit restricting access to the third floor after 4:00 p.m.  Pl. Opp. Ex. 26 at DEF_0856, DEF_0859–DEF_0860.  And, in response to Rosen's request to see the permit, Hernandez asked Jordan, NYPD Borough Safety Director for the DOE, whether Rosen could be provided with a copy of the permit.  Pl. 56.1 ¶ 160; Pl. Opp. Ex. 26 at DEF_0882.  Jordan responded that a copy could not be provided but that Rosen could review the permit in a secure location.  Pl. Opp. Ex. 26 at DEF_0882.  Assistant Principal Johnson then asked Rosen when she would like to view the permit, but Rosen proposed a time during which Johnson was not available, and there is no evidence that another appropriate time to view the

permit was ever suggested or scheduled.  *Id.* at DEF_0876–DEF_0880.  Rosen later filed a

complaint demanding to see the permit and stating that there was no training provided on school

safety regulations, but the record shows such a training was held and Rosen was present.  *Id.* at

DEF_0869–DEF_0874.  Rosen also filed a grievance in response to being escorted from the

building on multiple occasions.  *Id.* at DEF_0865–DEF_0867.  Rosen does not dispute that she

did, in fact, remain on the third floor after 4:00 p.m. several times, despite being told that it was

prohibited.  Rosen argues that other teachers were permitted to remain in the building but does

not argue that others were allowed to remain on the third floor.  *Id.* at DEF_0865.  Rosen has not

demonstrated that she was treated differently from other employees and has not shown that any

of the contentious interactions with administrators on the days she was escorted from the

building after being asked to leave the third floor were motivated by age discrimination.

Tenth, Rosen contends that she was erroneously disciplined for failing to show up to her

assigned class because the assignment was "patently unsafe," and the assignment was given to

her to contribute to a hostile work environment.  Pl. Opp. at 14.  Rosen repeatedly emailed

Principal Hernandez complaining about the assignment, stating that the class was

"disrespectful," "oppositional," noisy, and difficult to control.  Pl. Opp. Ex. 30 at 13–16.  The

record shows that, on all but one occasion, Rosen was assigned to this class along with another

teacher, and that, at least one time, when Rosen complained that the class was out of control,

another teacher came to assist her.  *Id.* at 10–11.  That teacher subsequently expressed to Rosen

that she should be familiar with her students, as she had been with that class for several months,

and that she should be able to handle the class.  *Id.* at 10.  Although Rosen claims that she was

concerned for her safety, her emails to administrators reflect that she was concerned about being

held liable for students' misbehavior, that she felt the students did not respect her and did not

23

"exhibit self-control which is necessary for safety," and that she did "not want the responsibility any more [sic] in dealing with this class." *Id.* at 7, 16. The record does not establish that there was an actual threat to Rosen's safety. Further, Assistant Principal Furnell routinely checked in with Rosen regarding disciplinary issues in that class, Rosen only once communicated an issue to Furnell, Furnell addressed that issue, and Rosen told Furnell that his routine check-ins were "harassing" her. *Id.* at 6. Rosen was not reassigned from this class, did not show up to her assignment on March 2, 2017, and did not notify anyone that she would not show up. Pl. Opp. Ex. 29. Rosen has not demonstrated that she was assigned to this class for a punitive or discriminatory purpose, does not contest that she unilaterally changed her assignment without prior approval, and has not shown that the resulting disciplinary action was pretextual or motivated by a discriminatory purpose.

Eleventh, Rosen alleges that Principal Hernandez "sought guidance from [DOE Human Resources] with respect to fashioning [Rosen's] rating in such a way as to best provide a pretextual excuse to justify removing her," and that Hernandez changed Rosen's rating for two benchmarks in order to assign Rosen an overall unsatisfactory rating. Pl. Opp. at 15. Hernandez states that she intended to give Rosen an overall unsatisfactory rating for the 2016-17 school year due to "all the disciplinary letters, all the dysfunction, . . . not being able to complete tasks, service students, [or] write appropriate IEPs," that DOE Human Resources informed Hernandez that all benchmarks needed to be rated unsatisfactory to produce an overall rating of unsatisfactory for the school year, and that she therefore amended Rosen's rating form to give her an unsatisfactory rating in all benchmarks. Def. Mem. Ex. B at 232:22–242:11. Rosen has not established that the change in ratings was made in order to discriminate against her because of her age.

Finally, Rosen contends that, throughout the 2016-17 school year, several of her responsibilities were given to a younger teacher, Malverty, as part of Principal Hernandez's scheme to replace Rosen with Malverty.  Pl. Opp. at 16.  Rosen alleges that Hernandez had a mentorship relationship with Malverty and that Hernandez purposefully selected Malverty to be a lead teacher so that Malverty could learn from Rosen and then replace her.  *Id.*  The record shows that Hernandez was required to serve as a mentor in the context of a professional program for which Malverty was selected by the DOE, Pl. Opp. Ex. 1 at 176:2-23, ECF No. 129-1, and that Malverty was selected by a DOE committee before being hired as a lead teacher by Hernandez, Pl. Opp. Ex. 32 at 3, ECF 129-33, along with two other teachers, Def. Mem. Ex. C at 126:6-19.  The record does not establish, and Rosen does not allege, that Rosen ever mentored Malverty.  Malverty did take on some of Rosen's responsibilities, as did five other teachers and the school's family worker.  *See* Pl. Opp. Ex. 25 at DEF_00069; Pl. Opp. Ex. 33, ECF No. 129-34; Pl. Opp. Ex. 34 at 2; Pl. Opp. Ex. 35 at 2; Pl. Opp. Ex. 36, ECF No. 129-37.  Many of the responsibilities Rosen contends were given to Malverty as part of a scheme to replace her were squarely within Malverty's duties as lead teacher, such as conducting special education professional development, Pl. Opp. Ex. 32, or not within Rosen's duties as IEP teacher, such as serving as the special education teacher of record at certain IEP meetings, Pl. Opp. Ex. 5 at DEF_1781.  Although Malverty did become the IEP teacher at P.S. 123 after Rosen's retirement, Malverty was undisputedly qualified for the role.  *See* Pl. 56.1 ¶¶ 170, 172, 174–75, 177.  That Rosen's role was subsequently filled by a younger teacher is insufficient to show age discrimination.  *See Schnabel*, 232 F.3d at 88.

Rosen has not provided evidence on the basis of which a reasonable trier of fact could conclude that age discrimination was a determinative factor in any of the disciplinary actions

taken against her or in the assignment of some of her responsibilities to other teachers.  Rosen

has not raised a triable issue of fact as to whether she was subjected to such "severe or . . .

pervasive" conduct because of her age such that it created a hostile work environment, *Terry v.*

*Ashcroft*, 336 F.3d 128, 149 (2d Cir. 2003) (citation and alteration omitted), or that her working

conditions were deliberately made intolerable due to her age such as to force an involuntary

resignation, *Trachtenberg v. Dep't of Educ. of City of N.Y.*, 937 F. Supp. 2d 460, 468 (S.D.N.Y.

2013).  And, Rosen has failed to show that Defendants' proffered reasons for their actions were

false, and that "more likely than not" age discrimination was the real purpose for Defendants'

actions.  *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996).

Because Rosen has presented no evidence from which it could reasonably be inferred that

she was discriminated against on the basis of age, the Court GRANTS summary judgment for the

DOE on Rosen's ADEA claim and for all Defendants on Rosen's NYSHRL claims.  The Court

has discretion to "decline to exercise supplemental jurisdiction" where, as here, it "has dismissed

all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Where all federal

claims are eliminated before trial, the balance of factors to be considered under the supplemental

jurisdiction doctrine point toward a federal court declining to exercise jurisdiction over the

remaining state and city law claims.  *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 405 (2d Cir.

2017) (Calabresi, J., concurring).  Because the NYCHRL sets out a different, more liberal

standard for discrimination claims, which the Court has not considered in this opinion, the Court

declines to exercise supplemental jurisdiction over Rosen's remaining claims under the

NYCHRL.  Accordingly, those claims are DISMISSED without prejudice.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED as to Rosen's claims under the ADEA and the NYSHRL.  The Court declines to exercise supplemental jurisdiction over Rosen's claims under the NYCHRL, and, therefore, those claims are DISMISSED without prejudice to renewal in state court.

The Clerk of Court is directed to terminate the motion at ECF No. 124 and close the case.

SO ORDERED.

Dated: March 27, 2023
      New York, New York

                                      ANALISA TORRES
                            United States District Judge